

The following constitutes the
Memorandum Decision of the Court.
Signed August 14, 2013

Roger L. Efremsky
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| In re | ) | Bankruptcy Case |
| MORTGAGE FUND '08 LLC, | ) | No. 11-49803 rle |
| | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | Adversary Proceeding |
| SUSAN L. UECKER, Liquidating | ) | No. 12-4099 rle |
| Trustee of Mortgage Fund '08 | ) | |
| Liquidating Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| KELLY WILLIAM NG, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM DECISION AFTER TRIAL**

**I. Introduction**

An involuntary chapter 7 case was filed against Mortgage Fund '08 LLC ("MF08") on September 15, 2011. Pursuant to stipulation, the court converted the case to chapter 11 and entered an order for relief. The court then confirmed a plan which established the MF08 liquidating trust and the MF08 liquidating trust agreement appointed Susan Uecker as trustee (the "Trustee").

The Trustee commenced this adversary proceeding on May 8, 2012. The matter went to trial on May 1 and May 2, 2013 on two claims for relief by which the Trustee seeks to avoid two transfers from MF08 to Kelly Ng on the theory that they were intentionally fraudulent transfers. The Trustee called only Mr. Ng as a witness. Mr Ng asserted his Fifth Amendment right not to testify to each question posed by the Trustee's counsel. Mr. Ng called Susie Parker and Vincent Hua as his witnesses. The parties submitted closing briefs. Docket nos. 126, 128, 131, 132.

The court has jurisdiction under 28 U.S.C. § 1334. The Verified First Amended Complaint alleges that this court has jurisdiction on the basis of 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (H), (K), (O). Docket no. 31, paragraph 3. Ng's Answer admits the allegations in this paragraph of the Verified First Amended Complaint. Docket no. 41, paragraph 3. The court interprets this as the parties' consent to its entry of a final judgment in this matter and what follows are the court's findings of fact and conclusions of law. If such consent is not given as the court assumes, what follows is to be treated as the court's proposed findings of fact, conclusions of law and recommendation.

Case: 12-04099   Doc# 134   Filed: 08/14/13   Entered: 08/15/13 19:14:42   Page 2 of
22

## II. Facts

The parties stipulated to relevant facts and the admission of relevant exhibits. Docket nos. 117, 118; the stipulated facts are referred to hereafter as "FS ¶ __" and exhibits are referred to as "Ex. __"; excerpts from the trial transcript are referred to as "witness, trial day _, p. _".

### A. Background Facts re MF08

MF08 was formed by Kelly Ng and his father Walter Ng in December 2007 as a Delaware limited liability company. It was formed in order to raise capital through the issuance of notes and making loans secured by real estate with the funds raised from the issuance of these notes. FS ¶ 2; Ex. 1, p. 7. MF08 raised more than $80 million from issuance of notes between December 2007 and April 2009. FS ¶ 3.

MF08's affiliates, initially an entity known as Bar-K, Inc. and later replaced by an entity known as Lend, Inc., acted as MF08's loan servicer. Another affiliate, R.E. Loans, LLC, was a similar mortgage lender managed at relevant times by Ng's father Walter Ng. MF08's manager and sole member was the Mortgage Fund, LLC, a California limited liability company (the "Mortgage Fund"). Kelly Ng and Walter Ng were the Mortgage Fund's only members. At relevant times, all these entities - MF08, Bar-K, Inc., Lend, Inc., R.E. Loans, LLC, and the Mortgage Fund - used the same address in Lafayette, California.

MF08's documents presented at trial included the Note Purchase Agreement ("NPA"), security agreement, the private offering memorandum, the MF08 operating agreement, and the subscription agreement. Ex. 1, 1A, 1B, 1C, 1D.

Case: 12-04099   Doc# 134   Filed: 08/14/13   Entered: 08/15/13 19:14:42   Page 3 of 22

MF08 described its business in the executive summary of the private offering memorandum as a "new and attractive opportunity for qualified investors to achieve superior returns with a conservative risk profile through the purchase of promissory notes issued by the Company." Ex. 1, p. 7. This executive summary explained that "in order to participate in this opportunity, each prospective investor will subscribe to purchase notes pursuant to a note purchase agreement" and that the company's notes would be "issued to investors whose subscriptions are accepted by the Company in its discretion." The notes were to pay interest quarterly at no less than 8%. The notes were "an illiquid and long-term investment. No investor should subscribe to purchase a note unless it is prepared to hold the note until its maturity" at the end of 2014. The notes had a minimum one year holding period, and pre-payment was within the "sole discretion" of the company on terms described in the NPA. Ex. 1, p. 7; Ex. 1A; Ex. 1B; FS ¶ 4.

As the executive summary in the offering memorandum explained it, a prospective investor would deliver to MF08 funds in their proposed loan amount along with a subscription agreement. Ex. 1A, § 2.2(a). MF08 would then have the right to accept or reject the prospective investor's subscription. Pending acceptance, during what it called a "pre-qualification period," MF08 deposited the prospective investor's funds into an account known as the closing account or pre-admission account. FS ¶ 10; Ex. 1A, § 2.2(b); Ex. 1D. Upon acceptance, MF08 issued a note in the proposed amount and transferred the funds from the pre-admission account to its general operating account. Ex. 1A,

Case: 12-04099    Doc# 134    Filed: 08/14/13    Entered: 08/15/13 19:14:42    Page 4 of 22

§ 1.6, § 2.2(c).

The NPA provided that an investor had the right to withdraw its subscription at any time prior to acceptance by giving written notice to MF08. Ex. 1A, § 2.2(d). In this event, "a prospective purchaser's funds in the closing account shall be returned by the company without interest within five (5) business days after receipt by the company of notice of the withdrawal by the prospective purchaser or the rejection by the company of his subscription agreement." Ex. 1A, § 2.2(d). (The subscription agreement provided that instructions regarding making deposits into the closing account were to obtained from Kelly Ng or Susie Parker. Ex. 1D, p. 21, ¶ 3(f).)

The NPA provided that a noteholder's request for repayment would only be honored on the last day of any quarter so long as the note had been held for at least one year from issuance, 60-days written notice had been given unless this notice had been waived by MF08, and MF08 had determined, in its sole and absolute discretion, that repayment would not adversely affect its liquidity. Ex. 1A, § 1.4(a)(ii)(A)-(C); Ex. 1B, § 4(a)(i)-(ii).

MF08's controlling documents also set certain limits on its transactions with its affiliates. Ng is an affiliate by the definition in the NPA. Ex. 1A, § 5.1(a). Essentially, MF08 could sell one of its portfolio loans to an affiliate if it received net sales proceeds equal to the total unpaid balance of principal, accrued interest and other charges owing under the loan. Ex. 1A, § 5.7(d).

Finally, MF08's operating agreement - attached as an exhibit to the NPA - prohibited its manager - the Mortgage Fund, and by

*12-4099.Decision*                    -5-

extension Kelly Ng, from taking any action prohibited by the NPA, the notes, or the security agreement. Ex. 1D, § 4.5(v).

In March 2009, MF08 advised certain noteholders that their requests for withdrawals of principal would be "temporarily delayed" due to a "liquidity problem." FS ¶ 7; Ex. 49 (letter dated March 16, 2009).

In June 2009, MF08 posted a report on its website stating that eight of its loans were more than 120 days past due – in the aggregate amount of $7.6 million – and three of its loans were more than 90 days past due for an additional $166,799. FS ¶ 8; Ex. 14.

In September 2009, in a letter signed by Kelly Ng, MF08 told its investors that "since June 2009, we have been unable to pay out interest on the notes..." FS ¶ 19; Ex. 50. In October 2009, in a letter signed by Kelly Ng, MF08 told its investors it had decided not to post interest to noteholders' accounts until interest could be paid in cash. FS ¶ 20; Ex. 51.

**B. Facts re the Two Transfers Trustee Seeks to Avoid**

**1. The First Transfer – $370,000**

On March 24, 2009, a check for $370,000 was written from Kelly Ng's Individual Retirement Account at Pensco Trust Company ("Pensco") made payable to MF08. Ex. F, p. 3; Ex. 32. A Pensco document identifies this transaction as follows: "Acquire Private Note" and "Mortgage Fund 08 llc floating rate note." Ex. F, p. 4; Ex. 32, p. 2. A Pensco statement for Kelly Ng's account for the period January 1 through March 30, 2009 states that on March 24, 2009, $370,000 was withdrawn from Kelly Ng's account to "acquire private note" described as "MF08 floating rate note." Ex. F, p.

Case: 12-04099   Doc# 134   Filed: 08/14/13   Entered: 08/15/13 19:14:42   Page 6 of 22

2; Ex. 31.

On March 25, 2009, the $370,000 check was deposited by MF08 into the bank account it referred to as its pre-admission account. Ex. F, p. 3. On April 1, 2009, MF08 wrote a check for $370,000 on its pre-admission account and deposited it into the bank account it referred to as its operating account. Ex. F, p. 6. On April 2, 2009, $370,000 was transferred by wire from the operating account to Kelly Ng's Pensco account. Ex. F, p. 9; Ex. 30, p. 2.

The MF08 bank statement for the operating account for the period April 1 - April 30, 2009 shows that on April 1, 2009, $370,000 was deposited into the operating account. Ex. 30, p. 1. A Pensco statement for this same period shows a deposit of $370,000 on April 2, 2009 and describes it as "Pay off - trust deeds" for a "mortgage fund 08 llc floating rate note." Ex. 37.

MF08 also assigned Kelly Ng the account number 081ng_00 and this number is handwritten on the March 24, 2009 check from Ng's Pensco account. Ex. F, p. 3, p. 11. The May 8, 2012 MF08 account statement for Kelly Ng says he has "note increase" of $370,000 on April 1, 2009 and a "note decrease" on April 2, 2009 when the money was withdrawn. It also shows an accumulation of interest of $81.32 as of June 30, 2009. Ex. F, p. 11.

**2. The Second Transfer** - **Beriong Note and Deed of Trust**

On April 3, 2009, Ng transferred $695,000 by wire from his Pensco account to MF08. FS ¶ 14; Ex. 36. These funds were used to purchase an 85.8% interest in a promissory note held by MF08 known as the Beriong Note. FS ¶ 14; Ex. 37. The Beriong Note had a principal balance of $810,000, bore non-default interest at 12%

*12-4099.Decision* -7-

and default interest at 18%; it was secured by a first priority deed of trust on an apartment building in San Francisco. FS ¶ 15. A note on Ng's Pensco "payment and funding instructions" indicates that Ng may have intended to purchase 100% of the Beriong note.[1] FS ¶ 16; Ex. 35.

Walter Ng, as manager of MF08, signed an assignment of promissory note and an assignment of deed of trust bearing the date of March 30, 2009, which assigned to Ng an 85.8% interest in the Beriong Note. Ex. 38. However, the assignment of the deed of trust was not recorded until July 6, 2009. FS ¶ 17; Ex. 39.

The obligor on the Beriong Note had stopped making payments as of October 2008 and MF08 recorded a notice of default on March 19, 2009. FS ¶ 18; Ex. E. The Beriong obligor filed bankruptcy on August 14, 2009. Ex. E, p. 1; Ex. 79 (motion for relief from stay filed June 3, 2010 in Beriong obligor's bankruptcy case, supported by declaration of Kelly Ng stating he is employee and custodian of records for Bar-K, Inc., loan servicing agent for R.E. Loans, its successors and assignees).

In a January 2010 summary of its loan portfolio, MF08 told its noteholders that the "[Beriong] first is a shared first deed of trust of $810,000 in which MF08's current balance is $115,000. The original independent appraisal was $2,750,000. Our valuation at the time of the loan was $2,200,000." FS ¶ 22; Ex. D, p. 9-10.

At the time Ng acquired his interest in the Beriong Note, MF08 also held a second priority deed of trust on the Beriong

_____

[1]/ Ng's Pensco funding instructions say "fund $695,000 [r]emainder upon cash rece____ in lender's Pensco account." Ex. 35.

Case: 12-04099   Doc# 134   Filed: 08/14/13   Entered: 08/15/13 19:14:42   Page 8 of 22

property securing a $2.65 million loan to the principal of Beriong which was secured by several other properties. Ex. A. At the time Ng acquired his fractional interest in the Beriong Note, the Beriong borrower owed approximately $55,000 in interest and late charges. Ex. G.

Ng admits in his closing brief that his acquisition of the Beriong Note did not comply with the restrictions on affiliate transactions in the NPA and he did in fact pay less than he should have to acquire his 85.8% interest. Docket no. 128, p. 9. Specifically, to fully comply, he would have had to acquire 100% of the note plus pay the accrued interest and late charges that were owed at the time he acquired it. Ex. 1A, § 5.7(d).

On March 12, 2013, the court approved the Trustee's sale of the Beriong property free and clear of Ng's interest for $2,037,500. MF08 Docket no. 331. The Trustee is holding the net proceeds of the sale pending resolution of this adversary proceeding in an amount sufficient to pay Ng in full if he prevails in this adversary proceeding.

**III. Discussion**

The Trustee seeks to avoid the two transfers described above on the theory that they qualify as intentionally fraudulent transfers under California's version of the Uniform Fraudulent Transfer Act (the "UFTA") which is applicable here through Bankruptcy Code § 544(b)(1) (trustee may avoid an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim).

**A. Fraudulent Transfers**

California Civil Code § 3439.04(a) provides that "a transfer

Case: 12-04099    Doc# 134    Filed: 08/14/13    Entered: 08/15/13 19:14:42    Page 9 of 22

made or obligation incurred by a debtor is fraudulent as to a
creditor, whether the creditor's claim arose before or after the
transfer was made or the obligation was incurred, if the debtor
made the transfer or incurred the obligation as follows: (1) with
actual intent to hinder, delay, or defraud any creditor of the
debtor."

Actual fraudulent intent is a question of fact which the
Trustee must prove by a preponderance of the evidence. See Liodas
v. Sahadi, 19 Cal.3d 278, 287 (1977) (discussing burden of proof
for fraud under California law); Calvert v. Foster Radford (In re
Consol. Meridian Funds), 487 B.R. 263, 267 (Bankr. W.D. Wash.
2013) (applying Bankruptcy Code § 548 and Washington's version of
the UFTA). California law and the Bankruptcy Code contain similar
definitions of fraudulent transfer and cases decided under each
are useful. Wyle v. Rider (In re United Energy Corp.), 944 F.2d
589, 594 (9th Cir. 1991).

Typically, actual fraudulent intent is established by
circumstantial evidence since rarely will the debtor testify
under oath that he or she intended to defraud creditors. Leonard
v. Coolidge (In re Nat'l Audit Def. Network), 367 B.R. 207, 219
(Bankr. D. Nev. 2007); Filip v. Bucurenciu, 129 Cal. App. 4th
825, 834 (2005). Thus, Cal. Civ. Code § 3439.04(b) provides that
a court may consider *certain factors* which, by inference, support
a finding of fraudulent intent. These "badges of fraud" are
listed in Cal. Civ. Code § 3439.04(b)(1)-(11).[2] "These factors do

---

[2]/ Cal. Civ. Code § 3439.04(b) provides: In determining
actual intent under paragraph (1) of subdivision (a),
consideration may be given, among other factors, to any or all of

Case: 12-04099   Doc# 134   Filed: 08/14/13   Entered: 08/15/13 19:14:42   Page 10 of
22

not create a mathematical formula to establish fraudulent intent. There is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud. This list of factors is meant to provide guidance for the trial court, not compel a finding one way or the other." Filip, 129 Cal. App. 4th at 834.

Bankruptcy courts are courts of equity and have the power to delve behind the form of transactions and relationships to determine their substance. See United Energy Corp., 944 F.2d at 596 (finding two contracts "intimately intertwined"). To that end, a segmented transaction may be viewed as one deal and the parties' labels may not be controlling as to the rights of third parties. Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.), 174 B.R. 557, 584 (Bankr. N.D.

the following:
(1) Whether the transfer or obligation was to an insider.
(2) Whether the debtor retained possession or control of the property transferred after the transfer.
(3) Whether the transfer or obligation was disclosed or concealed.
(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
(5) Whether the transfer was of substantially all the debtor's assets.
(6) Whether the debtor absconded.
(7) Whether the debtor removed or concealed assets.
(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.
(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

*12-4099.Decision*                    -11-

Cal. 1994).

MF08's intent must be discerned through its agents, and their intent may be imputed to MF08. See Consove v. Cohen (In re Roco Corp.), 701 F.2d 978, 984 (1st Cir. 1983) (fraudulent intent of president and sole shareholder imputed to corporation because of his position of control); National Audit Def. Network, 367 B.R. at 221 (fraudulent intent of corporate officers who signed checks, made wire transfers imputed to corporation in scheme to benefit insiders).

Here, Kelly Ng and his father were the only two members of the Mortgage Fund, the entity that managed and controlled MF08. Kelly Ng was clearly in a position to control MF08, and his intent may be imputed to it. Ng and his father were also principals in the other entities related to MF08, including Lend, Inc., Bar-K, Inc., and R.E. Loans. Ng and his father directly or indirectly derived income from these entities as explained in the description of the conflicts inherent in the management and management compensation in the MF08 private offering memorandum. Ex. 1, p. 11-17. Thus, intent may be imputed.

Once a plaintiff establishes fraudulent intent, the burden shifts to the transferee to prove some legitimate purpose for the transfer. See Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 806 (9th Cir. 1994) (applying Bankruptcy Code § 548); Cal. Civ. Code § 3439.08 (listing defenses).

**B. Fifth Amendment**

In addition to the inferences the Trustee urges the court to draw based on the badges of fraud, the Trustee urges the court to draw certain adverse inferences from the fact that Ng asserted

Case: 12-04099    Doc# 134    Filed: 08/14/13    Entered: 08/15/13 19:14:42    Page 12 of 22

his Fifth Amendment right not to testify at his deposition and at trial. Ng, trial day 1, p. 27-96.

The court may draw adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. Baxter v. Palmigiano, 425 U.S. 308 (1976).

Ng and the Trustee agree on the basic statement of the law here: the court has discretion to draw an adverse inference if there is a substantial need for the information, there is not another less burdensome way of obtaining it, and there is independent evidence to support the facts in question. Nationwide Life Ins. Co. v. Richards, 541 F.3d 903, 909 (9th Cir. 2008); Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1264 (9th Cir. 2000) (citing SEC v. Colello, 139 F.3d 674 (9th Cir. 1998)). Beyond this, they disagree vehemently.

Ng contends there is no corroborative evidence and the Trustee is attempting to take advantage of the fact that the Trustee failed to do appropriate discovery. He argues that the Trustee is asking the court to draw adverse inferences from the Trustee's questions themselves. The Trustee counters that the required groundwork exists here for each inference it asks the court to draw.

Based on the evidence submitted by the Trustee, the court did not need to rely on any of the adverse inferences arising from Ng's assertion of his right not to testify and exercises its discretion accordingly.

**C. The $370,000 Transfer**

The analysis of the $370,000 transfer must begin with

*12-4099.Decision*                    -13-

whether Ng was a noteholder. The Trustee acknowledges that there is no evidence Ng ever signed a note or the NPA. Nevertheless, because Ng - as the person managing MF08 - controlled whether a note was issued, the Trustee contends that the absence of a note is not determinative, and in fact, supports rather than negates a finding of fraudulent intent.

If Ng was a noteholder, the $370,000 belonged to MF08 and Ng would be subject to all the restrictions applicable to any other noteholder. Ng used his knowledge as an insider to take advantage of MF08 in this transaction, essentially securing the return of his full $370,000 when other noteholders were deprived of this full recovery.[3]

If Ng was not a noteholder, as he contends, the $370,000 remained his. MF08 returned Ng's own money to him and there was no improper transfer.

The Trustee emphasizes the following: Funds were moved from the pre-admission account to the operating account only when a prospective purchaser was accepted as a noteholder. Ng's funds were moved to the operating account on April 1, 2009. Notes had to be held for a minimum of one year and a request for repayment in advance of the one year holding period had to be in writing, had to be given 60 days in advance (unless there was a written waiver by the company), and the repayment was only made at the end of the relevant quarter, if at all. There is nothing in the record to show that Ng made such an early payment request and the

_____

[3]/ The Trustee estimates that there will be a 10% return to noteholder creditors in this case. Offer of proof re Trustee's testimony, trial day 1, p. 98.

12-4099.Decision                    -14-

Case: 12-04099   Doc# 134   Filed: 08/14/13   Entered: 08/15/13 19:14:42   Page 14 of 22

NPA provided that such requests were only honored if the company determined it would not adversely affect the company's obligations or liquidity. The Trustee points out that just weeks before the $370,000 was returned to Ng, MF08 had told certain investors that their requests for the return of their capital would not be honored due to the "tight economic conditions" and MF08 was "selling some loans at par to help promote cash..." Ex. 49, p. 1. Finally, while Ng could have requested the return of his funds prior to his acceptance as a noteholder by MF08, there is no evidence that Ng made a written request for the return of his $370,000 before it was transferred to the operating account and if he had made such a request, the funds could have been returned to him from the pre-admission account.

In addition to these terms of the NPA, the Trustee points to various documents that also indicate Ng was in fact a noteholder. He was assigned an investor account number. It is unclear exactly when this took place. It appears to have been March 24, 2009 because his investor account number is handwritten on his Pensco check of that date, but it may only have been when the $370,000 was deposited in the operating account as Parker's testimony suggested. The Pensco statements describe him as purchasing a floating rate note. The MF08 accounting system described him as a noteholder with a "note increase" and "note decrease" when the $370,000 went in and out of the operating account. He was credited with accrued interest on his account as other noteholders were. If a prospective investor did not become a noteholder, the investor did not receive interest on the funds in the pre-admission account for the time period they remained in

Case: 12-04099   Doc# 134   Filed: 08/14/13   Entered: 08/15/13 19:14:42   Page 15 of
22

the pre-admission account.

The Trustee also argues that several of the statutory badges of fraud support the conclusion that this was an intentionally fraudulent transfer. There is no question that Ng was an insider. Cal Civ. Code § 3439.04(b)(1). The transfer was concealed. Cal. Civ. Code § 3439.04(b)(3). MF08 did not receive reasonably equivalent value in exchange for the transfer. Cal. Civ. Code § 3439.04(b)(8). MF08 is presumed to have been insolvent at the time of the transfer according to the definition in Cal. Civ. Code § 3439.02(c). Cal. Civ. Code § 3439.04(b)(9).

In contrast, Ng emphasizes he never signed a note or the NPA and he was never listed on the schedule of noteholders referred to in the NPA. He contends the funds returned to him were at all times his own and never were the property of MF08. As such, by definition, there could be no fraudulent transfer.

Through his witness, former Lend, Inc. employee Susan Parker, Ng offered an explanation to support this theory. Susie Parker testified that the pre-admission account could receive but not make out-going wire transfers and the $370,000 was transferred from the pre-admission account to the operating account only so that the money could be wire-transferred to Ng's Pensco account. She also testified that she understood that the intention was to wire the $370,000 to Ng on the same day it was moved to the operating account but it remained there overnight instead. Because of this one-day delay, the MF08 computer system gave Ng an account number as if he had been a noteholder and his $370,000 accumulated - but never paid - one-day's interest. Parker, trial day 2, p. 11.

*12-4099.Decision*                    -16-

Parker also testified that calling Ng's $370,000 transaction a "note increase" and a "note decrease" on his "Investor Portfolio" account statement was "hardwired" into the MF08 computer system and any deposit into the operating account and any withdrawal from it would have had that language. Parker, trial day 2, p. 12-13.

The persuasiveness of Parker's explanation was weakened by the fact that she did not know *why* Ng had transferred $370,000 to MF08 (trial day 2, p. 6-7) and the evidence regarding her role in the transaction was conflicting.[4] Accordingly, her value in supporting a rational story for the $370,000 transaction was minimal.

Based on all of the above, the court concludes that Ng was in effect a noteholder and the transfer of the $370,000 to him was an actually fraudulent transfer. First, the record shows that this transfer was done with complete disregard for the rules set up by Ng for the operation of MF08 at a time when MF08 was in financial distress and had told other noteholders they would not be repaid as requested. See Eddy v. Temkin, 167 Cal. App.3d 1115 (1985) (ignoring formalities supported inference of fraud).

Second, several of the statutory badges of fraud are present here which support inferences of fraudulent intent. The transfer

---

[4] In a declaration, she stated that another Lend, Inc. employee had made the entries into the MF08 computer system. Ex. 28. At trial, she stated that she had in fact made the entries. Parker, trial day 2, p. 36. In her deposition, she was asked whether the pre-admission account was used for "first time investors" and replied that it was; in response to being asked if Ng was a "first time investor" she said yes. Ex. 80, p. 32.

Case: 12-04099   Doc# 134   Filed: 08/14/13   Entered: 08/15/13 19:14:42   Page 17 of 22

was to an insider. Cal. Civ. Code § 3439.04(b)(1). MF08 was
insolvent or became insolvent shortly after the transfer was made
according to the definition in Cal. Civ. Code § 3439.02(c)
because the company was illiquid and unable to pay its debts.
Cal. Civ. Code § 3439.04(b)(9). Based on the finding that Ng was
a noteholder, MF08 received less than reasonably equivalent value
for the $370,000 transfer. Cal. Civ. Code § 3439.04(b)(8).
Insolvency and lack of reasonably equivalent value are important
only as evidence of the existence of fraudulent intent. <u>Fross v.</u>
<u>Wotton</u>, 3 Cal.2d 384 (1935). The Trustee's argument that the
transfer was concealed leads nowhere. The Trustee did not show an
obligation to disclose this transaction but it is indicative of
the general lack of candor in the way the MF08 business was
operated.

Third, Ng offered no rational business purpose for this
transaction which could conceivably have rebutted the inferences
of fraud here. Susie Parker's explanation regarding the need to
wire transfer Ng's money was simply too frail to overcome the
many stronger indications in the record that support a finding
that this transfer was done with actual intent to hinder, delay
or defraud creditors.

Viewing the entire transaction in context, the record shows
that the $370,000 transferred from Ng's Pensco account to MF08 on
March 25 and then returned to Ng's Pensco account on April 2 had
no rational purpose other than to avoid MF08's creditors. The
fact that the money was moved to the operating account indicates
Ng had become a noteholder and, as such, was required to comply
with all the rules pertaining to the other noteholders. He was

Case: 12-04099   Doc# 134   Filed: 08/14/13   Entered: 08/15/13 19:14:42   Page 18 of
22

able to secure full repayment only because of who he was, and by doing so when he did it, he is the recipient of a fraudulent transfer. Based on all of the above, the court concludes that Ng took advantage of his position of control at MF08 to secure for himself the return of the $370,000 to the detriment of the other noteholders. The transfer must be avoided and recovered for the benefit of the estate.

### D. The Beriong Note and Deed of Trust

There is no question regarding the fact that on April 3, 2009, Ng transferred $695,000 from his Pensco account to MF08 and was assigned an 85.8% interest in the Beriong Note which had a face amount of $810,000.

The Trustee argues that there is substantial evidence to support a conclusion that Ng's acquisition of the Beriong Note was an actually fraudulent transfer. The Trustee contends that several badges of fraud are present here. Ng was an insider. Cal. Civ. Code § 3439.04(b)(1). The transfer was concealed from MF08's investors when it communicated with investors in January 2010 (Ex. D, p. 10, p. 14) and when MF08 filed a motion for relief from stay in the Beriong bankruptcy case, supported by a declaration signed by Ng on behalf of the moving party (Ex. 79). Cal. Civ. Code § 3439.04(b)(3). Ng paid less than the full price for his interest and acquired it in violation of the terms of the NPA. Cal. Civ. Code § 3439.04(b)(8). MF08 is presumed to have been insolvent at the time of the transaction by the statutory definition because it was illiquid and unable to pay its debts. Cal. Civ. Code § 3439.02(c); Cal. Civ. Code § 3439.04(b)(9).

In short, Ng used his knowledge (of both the real estate

*12-4099.Decision*                    -19-

market and MF08's performance) and his position of control to select a valuable asset from the MF08 portfolio and acquire it at a discount while MF08 was in financial distress. Even though the loan was in default at the time Ng bought it, Ng knew there was no risk involved because of the value of the property and because MF08 also held the second priority deed of trust on the property and would ensure that its second position was protected. If necessary, he could cause MF08 to pay the first deed of trust.

In response, Ng argues that other than his insider status, there is no evidence to support a finding of actual fraudulent intent. Ng is correct that the mere fact that he is an insider - standing alone - may not be enough. See Nasr v. Geary, 2003 U.S. Dist. LEXIS 13887 (C.D. Cal. June 9, 2003) (citing Legislative Committee Comment to Cal. Civ. Code § 3439.04). He acknowledges that he paid only "par" for the Beriong Note instead of paying accrued interest and late charges but contends MF08 sold notes to third parties on the same terms. Hua, trial day 2, p. 52-54. He also acknowledges that the transfer did not "fully comport" with the requirements for affiliate transactions. Docket no. 128, p. 9. However, he contends there is no evidence he knew of the terms of the NPA regarding affiliate transactions. This argument is either nonsensical or offensive. Ng controlled MF08 and the Mortgage Fund, his name appears on the signature line of the NPA. He is assumed to know the rules regarding his own game.

After review of the above, the court concludes that MF08's transfer to Ng of the partial interest in the Beriong Note was done with actual fraudulent intent. While the Trustee argues that MF08 concealed this transfer, the Trustee does not adequately

Case: 12-04099   Doc# 134   Filed: 08/14/13   Entered: 08/15/13 19:14:42   Page 20 of 22

explain the basis for a duty to disclose and thus the court declines to give this factor any significant weight. The other badges of fraud listed above are sufficiently shown by the record in this case. The transfer did not comply with the terms of the NPA, it was made at a time when MF08 had stopped performing as promised to its noteholders. Yet MF08 transferred to Ng a note that earned 12% non-default interest and 18% default interest (admittedly shared with its servicing entity), which was secured by a first priority deed of trust on commercial real property in San Francisco that had been valued at between $2.2 – $2.7 million. The nature of the loan and the timing of its transfer to an insider in control of MF08 all support a finding of actual fraud in the context of this case. The fact that the property has been sold and the Trustee is holding sufficient funds to fully pay the first deed of trust supports the Trustee's argument that Ng acquired a low-risk asset from the MF08 portfolio using his position as an insider to the detriment of the MF08 noteholders.

**IV. Conclusion**

The Trustee is entitled to a judgment avoiding the transfer of the $370,000 to Ng. The Trustee is entitled to a judgment avoiding the transfer of the Beriong Note to Ng and the Trustee is entitled to recover Ng's purported share of the proceeds of the sale of the Beriong property. The court requests the Trustee to submit a judgment so providing.

Each side shall bear its own costs.

* * * * **End of Decision** * * * *

Case: 12-04099    Doc# 134    Filed: 08/14/13    Entered: 08/15/13 19:14:42    Page 21 of 22

**Court Service List**

All parties by ecf